## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| YINGLI ENERGY (CHINA) COMPANY LIMITED )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>AMERICAN ALLIANCE FOR SOLAR MANUFACTURING )<br><br>Defendant-Intervenor ) | Court No. 24-00131<br><br><br>**PUBLIC VERSION** |

## <u>PLAINTIFF'S RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD</u>

<div align="right">

Gregory S. Menegaz
Alexandra H. Salzman
Judith L. Holdsworth
Vivien Jinghui Wang
**deKieffer & Horgan, PLLC**
Suite 1101
1156 15th St., N.W.
Washington DC  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*

</div>

Dated: January 16, 2025

TABLE OF CONTENTS

I.      RULE 56.2 STATEMENT ...............................................................................................

        A.      Administrative Determination Subject to Appeal...................................................

        B.      Issues Presented .....................................................................................................

II.     STATEMENT OF FACTS ..............................................................................................

III.    STANDARDS OF REVIEW ..........................................................................................

IV.     ARGUMENT ...................................................................................................................

        A.      Commerce's Conclusion that Yingli China's Export and Sales to the United
                States are Controlled by the Chinese Government is Not Supported by
                Substantial Evidence...............................................................................................

        B.      No Legal Authority Supports Commerce's Application of the "NME
                Presumption" as to Yingli China. ..........................................................................

V.      CONCLUSION AND PRAYER FOR RELIEF ...............................................................

# TABLE OF AUTHORITIES

## CASES

*Advanced Tech. & Materials Co. v. United States*, 938 F. Supp. 2d 1342 (2013) ........................14

*Advanced Tech. & Materials Co. v. United States*, 581 Fed. App'x 900 (Fed. Cir. 2014)...........14

*Am. Tubular Prods., LLC v. United States*, 2015 Ct. Intl. Trade LEXIS 103 (Ct. Int'l Trade Aug. 28, 2015). ....................................................................................................................6, 13

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)...........................................6

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc*., 419 U.S. 281 (1974) ..................................7

*Chevron, U.S.A., Inc. v. NRDC, Inc*., 467 U.S. 837 (1984).....................................................17, 19

*China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028 (Fed. Cir. 2021) ................................20

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197 (1938) .................................................6

*Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304 (Fed. Cir. 2017)....................20

*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (1983)..........................................6

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ..............................................................7

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997)..............................................6

*Guizhou Tyre Co. v. United States*, 641 F. Supp. 3d 1371 (Ct. Int'l Trade 2023) ........................20

*Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014)................................................................................................................ 9-10, 14

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 121 F. Supp. 3d 1263 (Ct. Int'l Trade 2015)................................................................................................................................14

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F. Supp. 3d 1224 (Ct. Int'l Trade 2021)................................................................................................................................17

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 617 F. Supp. 3d 1343 (Ct. Int'l Trade 2023)................................................................................................................. 16-19, 21

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024). ...................................... 17, 18-19, 21

*Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301 (Fed. Cir. 2009) ......................................6, 13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983);..........................................................................................................................................7

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ......................................................21

*Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87 (1995) ......................................21

*Shandong Rongxin Imp. & Exp. Co. v. United States,* 163 F. Supp. 3d 1249 (Ct. Int'l Trade 2016) .........................................................................................................................6

*Sigma Corp. v. United States*, 117 F.3d 1401 (Fed. Cir. 1997) ..........................17, 20

*Thai Plastic Bags Indus. Co. v. United States*, 904 F. Supp. 2d 1326 (Ct. Int'l Trade 2013) .........6

*Torrington Co. v. United States*, 68 F.3d 1347 (Fed. Cir. 1995) ................................20

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ...............................................6

*West Virginia v. EPA*, 597 U.S. 697 (2022).................................................................18

*Xi'an Metals & Minerals Imp. & Exp. Co. v. United States*, 50 F.4th 98 (Fed. Cir. 2022) ..........22

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308 (Ct. Int'l Trade 2018)................................................................................................ 15-16, 21

**STATUTES**

19 U.S.C. § 1516a(b)(l)(A) ........................................................................................5, 7

19 U.S.C. § 1675(a)(2) ...................................................................................................9

19 U.S.C. § 1677(18) .....................................................................................................8

19 U.S.C. § 1677b(c)(4).................................................................................................22

19 U.S.C. § 1677e ......................................................................................16, 18, 22

19 U.S.C. § 1677f-1(c)(1)..............................................................................................9

19 U.S.C. § 1677f-1(c)(2)..............................................................................................16

**ADMINISTRATIVE DECISIONS**

*Circular Welded Carbon Quality Steel Line Pipe from China*, 74 Fed. Reg. 14,514 (Dep't Commerce Mar. 31, 2009) ......................................................................................15

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary*

*Determination of No Shipments; 2021–2022*, 89 Fed. Reg. 457 (Dep't Commerce January 4, 2024) .................................................................................................................5

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2021-2022*, 89 Fed. Reg. 55,562 (Dep't Commerce July 5, 2024) .........................................................1

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 7,060 (Dep't Commerce February 2, 2023)................................................................ 1-2

*Small Diameter Graphite Electrodes from China*, 81 Fed. Reg. 62,474 (Dep't Commerce Sept. 9, 2016) .......................................................................................................15

*Utility Scale Wind Towers from China*, 77 Fed. Reg. 75,992 (Dep't Commerce Dec. 26, 2012) ...................................................................................................................15

## I.    RULE 56.2 STATEMENT

Pursuant to Rule 56.2 (c)(1), Plaintiff Yingli Energy (China) Company Limited ("Yingli China"), hereby states the administrative decision subject to appeal and the issues of law presented:

### A.    Administrative Determinations Subject to Appeal

The U.S. Department of Commerce ("Commerce") published the contested final results in the Federal Register on July 5, 2024.  *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2021-2022*, 89 Fed. Reg. 55,562 (Dep't Commerce July 5, 2024) ("Final Results"), **PR389,** *incorporating* Issues and Decision Memorandum ("Final IDM") **PR383.**

### B.    Issue Presented

1.  <u>Issue One</u>:  Whether Commerce's determination that Yingli China's export activities and sales to the United States are controlled by the Chinese government is supported by substantial evidence.

2.  <u>Issue Two</u>: Whether Commerce's application of the "NME Presumption" as to Yingli China was arbitrary and capricious because no legal authority supports Commerce's presumption, and Commerce was obligated by law to calculate an individual dumping margin for Yingli China as a mandatory respondent.

## II.    STATEMENT OF FACTS

Commerce initiated this review on February 2, 2023.  Dep't Commerce,  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 7,060 (February 2,

2023) ("Initiation Notice").  **PR29.**  The period of review ("POR") is December 1, 2021 through

November 30, 2022.  Commerce selected Yingli China as a mandatory respondent in this review.

*See* Dep't Commerce, Memorandum re: *Respondent Selection* (April 20, 2023), **CR71; PR121.**

Although Commerce collapsed eight of Yingli China's subsidiaries together with Yingli as a

single entity for review, Yingli China explained in its Section A questionnaire response that

several of the named companies had ceased operations before the beginning of the POR and

others did not produce subject merchandise for export to the United States.  *See* Final IDM at 1,

n2, **PR383;** *and* Yingli. Section A Questionnaire Response (May 18, 2023) at 14-15 ("Yingli

Sec. A Rsp."), **CR74-78; PR160-161**.  Yingli China was not a producer of subject merchandise

during the POR but rather purchased subject merchandise from unaffiliated manufacturers and

exported the merchandise to the United States.  Yingli Sec. A Rsp. at 15, 26 & 34.  All of Yingli

China's sales to the United States of the merchandise under consideration were to its former U.S.

affiliate Yingli Green Energy Americas, Inc. ("YGEA"), which resold the merchandise to

unaffiliated U.S. customers.  *Id*. at 1-2.  YGEA has full autonomy in dealing with U.S. customers

for the sale of subject merchandise.  As Yingli reported:

> After negotiation, YGEA and the customers arrive at a mutual agreement on the
> price and then the U.S. customers will sign sales contracts or place orders with
> YGEA. YGEA's manager has the ultimate authority to determine the selling
> prices and contractually bind YGEA to sell merchandise. There is no outside
> organization that reviews or approves any aspect of the sales transaction.

Yingli Sec. A Rsp. at 9.

Yingli China and YGEA operate under separate ownership.  YGEA is 100% owned by

[                                                                    ], a foreign legal entity

registered in the British Virgin Islands ("[        ]" or "BVI Parent Company").  *Id*. at 16-17.  In

its supplemental questionnaire response, Yingli China also responded correctly that Yingli China

PUBLIC VERSION

and YGEA did not have common owners or managers or directors during the POR, but because

YGEA's general manager was also the vice president of Yingli China's sales department, Yingli

China reported the two companies as affiliated in this respect.  Yingli First Supplemental

Questionnaire Response (August 4, 2023) at 8-10 ("Yingli Supp. Rsp."), **CR165-176; PR244**.

Further, POR sales data that Commerce collected from Yingli China were almost exclusively

YGEA's data, including ocean freight and U.S. transportation costs (YGEA sold the subject

merchandise on a [        ] basis), warehousing, marine insurance, credit expenses, indirect selling

expenses, and inventory carrying costs.  *See* Yingli Section C Response (June 13, 2023) at

narrative 2-3, 6-7, 14-20 and 25-28, App XII & Exhs. C-1, C-5, C-6, C-7 & C-9 ("Yingli Sec. C

Rsp."), **CR98-99; PR196 - -;** *see also* Yingli Supp. Rsp. at Exhs. SQ1-9, SQ1-10, . SQ1-11,

SQ1-13 through SQ121, **CR165-176, PR244**.

      BVI Parent Company is also Yingli China's former owner, but in [                ]

ownership of Yingli China was transferred to two entity shareholders, [


                                                         ].

Yingli Sec. A Rsp. at 18, **CR74-78; PR160-161.**  The current majority shareholder holding

[           ] of Yingli China, i.e. [                                    ], is

[       ] owned by the [

                                    ] and [       ] owned by [

            ].  *Id*. at 3.

      Commerce calculated that this change in ownership resulted in the Government of China

("GOC") indirectly through [                  ] owning [           ] of Yingli China during the

POR.  Even before Commerce issued its preliminary results of the administrative review,

Commerce ceased its review of Yingli China and released a memorandum in which Commerce

selected an alternative mandatory respondent.  Dep't Commerce, Memorandum re: *Respondent*

*Selection* (September 8, 2023), **CR200**; **PR269** ("Add'l Respondent Memo").  In this

memorandum, Commerce cited to Yingli China's Section A and Supplemental responses and

concluded:

> On its face, the foregoing record evidence indicates that the government of China
> has the potential to exercise, and does exercise, control over Yingli Energy
> China's operations generally.  In turn, as the [
>                          ] in the Yingli single entity, Yingli Energy China is in a position to
> control [                                                    ].  Hence, the government of China
> is in a position to control the entire Yingli single entity.  Given this record
> evidence, which calls into question Yingli's ability to qualify for a separate rate,
> below we have considered whether Commerce continues to have the resources
> required to individually examine, and calculate a dumping margin for, two
> mandatory respondents such that we should select an additional mandatory
> respondent for individual examination.

*Id*. at 3.  In particular, Commerce noted that Yingli China's Articles of Association allowed

Yingli China's [



].  *Id*.

Despite Yingli China's timely and complete questionnaire responses demonstrating that

that the Chinese Government did not control its export activities and sales through YGEA, in its

Preliminary Results, Commerce continued to find that Yingli China was under *de facto* control

of the Chinese Government and therefore part of the PRC-entity.  Consequently, Yingli China

was not entitled to an individually calculated or separate antidumping rate.  *See Crystalline*

*Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic*

*of China: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Antidumping Administrative Review, and Preliminary Determination of No Shipments; 2021–2022*, 89 Fed. Reg. 457 (January 4, 2024), **PR340**, and accompanying Preliminary Decision Memorandum ("Prelim. Decision Memo"), **PR339.**

Yingli China filed a case brief, arguing that Commerce's conclusion of Government control over its export sales was speculative.  *See* Yingli Case Brief (February 12, 2024), **CR257**; **PR367**.  Commerce failed to properly analyze the *de facto* factors as to whether or not Yingli China demonstrated the absence of actual governmental control over its export activities.  Instead of confronting the record as a whole and YGEA's role in conducting Yingli China's export sales, Commerce considered only Yingli China's ultimate ownership.

In the Final Results, Commerce did not change its position.  Commerce maintained that U.S. antidumping law supports its practice to conclude that where a Chinese Government entity holds a majority equity ownership, either directly or indirectly, in a respondent Chinese exporter, this interest, in and of itself, suffices to conclude that the GOC controls the company's operations, generally.  *See* Final Results, **PR389**, and Final IDM at Cmt. 3 (p. 11), **PR383**.  Commerce also concluded that Yingli China was not able to prove that the GOC had *no power to influence* any of the four factors of the *de facto* analysis, and therefore Yingli is not eligible for a separate or individually calculated rate.  Final IDM at Cmt. 3 (pp. 10-11).

## III.    STANDARD OF REVIEW

The Court will only sustain Commerce's factual determination if it is based on substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938)).  Furthermore,

"substantial evidence" must be measured by a review of the record as a whole, "including

whatever fairly detracts from the substantiality of the evidence."  *Atlantic Sugar, Ltd. v. United

States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).  Thus, "it is appropriate to set aside the ITA's

decision when the court 'cannot conscientiously find that the evidence supporting that decision is

substantial, when viewed in the light that the record in its entirety furnishes, including the body

of evidence opposed to [its] view.'"  *Diversified Products Corp. v. United States*, 6 C.I.T. 155,

161, 572 F. Supp. 883, 888 (1983) (quoting *Universal Camera*, 340 U.S. at 488).  Moreover,

"Commerce's determination cannot be based on isolated tidbits of data which suggest a result

contrary to the clear weight of the evidence."  *Shandong Rongxin Imp. & Exp. Co. v. United

States,* 163 F. Supp. 3d 1249, 1252 (Ct. Int'l Trade 2016) (internal citation omitted).

        The substantial evidence standard "requires more than mere assertion of 'evidence which

in and of itself justified {the determination}, without taking into account contradictory evidence

or evidence from which conflicting inferences could be drawn.'"  *Gerald Metals, Inc. v. United

States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quoting *Universal Camera*, 340 U.S. at 487).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "Speculative

claims that are plausible in theory but unsupported in fact do not make the cut." *Am. Tubular

Prods., LLC v. United States*, 2015 Ct. Intl. Trade LEXIS 103, at *23-24 (Ct. Int'l Trade Aug. 28,

2015).  *See also Thai Plastic Bags Indus. Co. v. United States*, 904 F. Supp. 2d 1326, 1332 (Ct.

Int'l Trade 2013) (citing *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1327 (Fed. Cir.

2009) ("It is well established that speculation does not constitute substantial evidence.")).

PUBLIC VERSION

Further, the Court will also hold as unlawful any administrative decision that is arbitrary, capricious, or an abuse of discretion. *See* 19 U.S.C. § 1516a(b)(l)(A). Normally, an agency decision would be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency "must cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs.*, 463 U.S. at 48 (citations omitted). Internal inconsistency and self-contradiction do not satisfy this requirement.

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions. The agency 'must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.' That requirement is satisfied when the agency's explanation is clear enough that its 'path may reasonably be discerned.' But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (first quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); then quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc*., 419 U.S. 281, 286 (1974).

IV.    **ARGUMENT**

   A.    **Commerce's Determination that Yingli China's Exports and Sales to the United States are Controlled by the Chinese Government is Not Supported by Substantial Evidence.**

The underlying administrative review in this case concerns exports of solar cells and modules from China, which Commerce treats as a nonmarket economy ("NME") country.  *See* 19 U.S.C. § 1677(18) (definition of a NME country).  Commerce's policy is to presume that all companies within the NME country are subject to control by the Chinese Government unless the company demonstrates the absence of both *de jure* and *de facto* Government control over its export activities.  *See* Dep't Commerce, Import Administration Policy Bulletin No. 05.1 re: *Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries* (April 5, 2025) ("Policy Bulletin 05.1").  To establish the absence of government control over export activities, Commerce analyzes the following set of factors for *de facto* control:

> (1) set their own export sales prices independent of the government and without the approval of a government authority; (2) have the authority to negotiate and sign contracts and other agreements; (3) maintain autonomy from the government in making decisions regarding the selection of management; and (4) retain the proceeds of their respective export sales and make independent decisions regarding the disposition of profits or financing of losses

Prelim. Decision Memo at 13, **PR339.**  For analyzing *de jure* control, Commerce considers the following factors:

> (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) legislative enactments decentralizing control over the export activities of companies; and (3) other formal measures by the government decentralizing control over the export activities of companies.

*Id*. at 12.

Responding companies under investigation or review for the first time complete a separate rate application ("SRA") that requests information from exporters to establish *de facto* and *de jure* separateness from the GOC. After a company has demonstrated this separateness, and Commerce has calculated a separate rate for the company in a review or investigation, the company can file a separate rate certification ("SRC") in subsequent reviews, declaring that nothing has changed to impact Commerce's separate rate analysis. Yingli China timely submitted a separate rate certification in this case. Yingli China *SRC* (March 6, 2023). **CR6; PR66.** As stated above, when Commerce selected Yingli China as a mandatory respondent in this review, Yingli China responded to Commerce's questionnaires to establish the lack of GOC control and provide the necessary data for Commerce to calculate an individual antidumping margin for Yingli China as provided in 19 U.S.C. § 1675(a)(2) ("the administering authority shall determine . . . the dumping margin for each entry") and 19 U.S.C. § 1677f-1(c)(1) ("In determining weighted average dumping margins, the administering authority shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise.").

In this case, Commerce did not find that the GOC exercised *de jure* control over Yingli China. Prelim. Decision Memo at 13, **PR339.** In other words, there are no restrictive stipulations associated with the Yingli China's business and export licenses; applicable legislative enactments decentralize the control of companies; and formal measures by the GOC decentralize control of Chinese companies. *See also, Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F. Supp. 3d 1317, 1346-47 (Ct. Int'l Trade 2014) ({W}here "respondents 'placed on the record laws, regulations, business licenses, export licenses, and other

documents demonstrating [sufficient] *de jure* independence from the government on the relevant issues.'")

Commerce did find, however that the GOC *de facto* controlled Yingli China. Prelim. Decision Memo at 13 and Final IDM at Cmt. 3 (pp.9-14), **PR383**. In its analysis, of the *de facto* control factors, Commerce almost completely ignores the fact that YGEA conducts all export sales with its U.S. customers. Final IDM at Cmt. 3 (pp.9-140). YGEA is owned and controlled by BVI Parent Company. Nothing on the record suggests that BVI Parent Company is controlled by GOC. Indeed, Commerce does not question the independence of companies wholly owned by a foreign entity, as here. "{I}f Commerce determines that a company is wholly foreign-owned or located in a market economy (ME) country, then analysis of the *de jure* and *de facto* criteria are not necessary to determine whether the company is independent from government control and eligible for a separate dumping margin." Prelim. Decision Memo at 10.

Commerce merely speculates that YGEA's general manager is controlled by GOC because she is also the vice president of Yingli China in charge of sales. *See* Dep't Commerce, Memorandum, re: *Proprietary Information for the Final Results of the 2021-2022 Antidumping Duty Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or not Assembled into Modules, from the People's Republic of China* (June 28, 2024) at 4 ("Proprietary Memo"), **CR267**; **PR385**. Commerce claims:

> Yingli reported that YGEA's general manager, [                    ], is also the vice president of Yingli China in charge of sales.20 The excerpts from Yingli China's Articles of Association listed under Footnote 41 above show that the [
>
>
>
>                                                    ] The Vice President of Yingli China in charge of sales can reasonably be considered to be part of senior management.

PUBLIC VERSION

> Because the Chinese government has the power to control [
> ], it has the power to influence [
> ], including price setting and decisions regarding signing contracts.

*Id.*  The above analysis concerns potential control over Yingli China's vice president in charge of sales, not over YGEA's general manager, regardless of whether the same person holds these two positions.  It is irrational and arbitrary to presume that BVI Parent Company would allow interference from GOC in the business activities of its subsidiary.  YGEA and BVI Parent Company have the ultimate authority and power to prescribe to YGEA's general manager her proper duties and relieve her from her duties if they discern that her actions are dictated or even influenced by any authority other than Yingli China or BVI Parent Company.  Yingli China's Articles of Association with its shareholders has no influence over YGEA's general manager's conduct.

Since all of its export activities are conducted through YGEA, Yingli China has thus demonstrated on this record that it is *de facto* independent of GOC control in its export activities. The first factor Commerce considers is whether the company sets its own export sales price independent of government involvement or approval.  All of the sales to the United States of the merchandise under consideration were to YGEA, which resold the merchandise to unaffiliated U.S. customers. Yingli Sec A Rsp. at 1-2, **CR74-78; PR160-161**.  YGEA is an American company, completely independent of any Chinese government control.  *See Id*., Exh. A-4 (Yingli China affiliation chart).  YGEA sets its prices through arm's length negotiations with the U.S. customers via telephone, email, or face-to-face meetings.  *Id*. at 9.  The U.S. customers inquire with YGEA for a price quotation.  After negotiation, YGEA and the customers arrive at a mutual agreement on the price and then the U.S. customers will sign sales contracts or place orders with YGEA. YGEA's manager has the ultimate authority to determine the selling prices and

contractually bind YGEA to sell merchandise. There is no outside organization that reviews or approves any aspect of the sales transaction. *Id*. The prices of merchandise that are set by YGEA are not subject to review by, or approval of, Yingli China's shareholders, Yingli China's management, or any of Yingli China's affiliates. Yingli Supp. Rsp., at 14, **CR165-176, PR244**. YGEA's independence is further demonstrated on the record by the price negotiation emails. Yingli Sec. A Rsp. at Exhibit A-6.1, **CR74-78; PR160-161**. The sample sales documentation also demonstrate that no other party is involved in YGEA's transactions. *Id*. at Exhibit A-6.2. Yingli China has thus demonstrated independence in price negotiations for this first factor.

The second factor considers whether the company has the authority to negotiate and sign contracts and other agreements. This independent authority was also demonstrated by the exhibits cited above. The price negotiation and contracts were signed by YGEA with no involvement of GOC authorities.

The third factor considers whether the company maintains autonomy from the GOC in its selection of management. Yingli China's Articles of Association demonstrate this autonomy. *See* Yingli Supp. Rsp. at Exhibit SQ1-8, **CR165-176, PR244**. As discussed above, regardless of any *potential* GOC influence on Yingli China's selection of management (the administrative record contains *no evidence of actual* influence or interference), nothing on the record of this case indicates that the GOC has any factual or legal authority to reach beyond its borders to influence either YGEA or BVI Parent Company. No article in Yingli China's Articles of Association regulates either Yingli China's or its shareholders rights and obligation vis-à-vis YGEA or its parent company.

The last factor considers whether the company retains the profits from its export sales and makes independent decisions regarding the disposition of profits or losses. Yingli China explained that there is no any restriction on the use of Yingli China's export revenue. Yingli Sec. A Resp. at 10, **CR74-78; PR160-161**. More crucially, nothing on the record of this case indicates that either Yingli China or its shareholders have any way to gain access to YGEA's profits from its POR sales to U.S. customers or direct YGEA on the disposition of its profits.

The purpose of the four prong *de facto* analysis is to determine whether or not Yingli China and YGEA are subject to *de facto* governmental control *over their export functions*. The record evidence demonstrates that Yingli China and YGEA's management control all of the companies' day- to-day operations including export activities, and SASAC was not involved in any of these operational activities. Commerce failed to analyze these factors, stopping merely at the ultimate ownership of Yingli China and speculating that SASAC would have the potential for *de facto* control. "Speculative claims that are plausible in theory but unsupported in fact do not make the cut." *Am. Tubular Prods., LLC v. United States*, 2015 Ct. Intl. Trade LEXIS 103, at *23-24 (Ct. Int'l Trade Aug. 28, 2015). *See also Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1327 (Fed. Cir. 2009): ("It is well established that speculation does not constitute substantial evidence."). Commerce's separate rate denial was based on just such speculation, and Commerce considered only the mere possibility of control rather than actual control.

## B. No Legal Authority Supports Commerce's Application of the "NME Presumption" as to Yingli China.

This Court has held that separate rate denials must be based on actual government control as opposed to mere potential to control:

PUBLIC VERSION

> {T}hese facts alone are not dispositive of the de facto autonomy inquiry, because
> they speak solely to the possibility for governmental control over export activities
> through these persons, not whether such control was in fact reasonably likely to
> have been exercised . . . .
> {I}n an NME country, there will usually be state involvement and authority to
> intervene in commercial affairs. But this fact alone does not necessarily lead to
> the conclusion that all NME producers and exporters should be categorically
> treated as in fact setting their prices according to some centralized strategy.

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F.Supp.3d 1317, 1348-50 (Court

Int'l Trade 2014) (footnotes omitted) ("*Jiangsu Jiasheng I*").  Although the *Jiangsu Jiasheng I*

Court affirmed Commerce's determination that several Chinese exporters were not controlled by

the GOC, Commerce requested a voluntary remand to reconsider its approach to granting

separate rate status to GOC-owned exporters in light of the diamond sawblades litigation

(*Advanced Tech. & Materials Co. v. United States*, 938 F. Supp. 2d 1342 (2013), *aff'd*, 581 Fed.

App'x 900 (Fed. Cir. 2014)).  *See Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 121

F. Supp. 3d 1263, 1267 (Ct. Int'l Trade 2015) ("*Jiangsu Jiasheng II*"); *see also* Final IDM at 13-

14.  As a result of its further review of exporters with some degree of GOC ownership in its

*Jiangsu Jiasheng* remand proceedings, Commerce continued to grant separate rate status to only

one Chinese exporter in which the GOC held only a minority shareholder interest.  *Id*. at 1267-

1268.  The Court affirmed Commerce's remand results.  *Id*. at 1273.  Regarding the single

exporter still found to operate independently from the GOC, the Court stated: "Commerce's

weighing of the evidence to conclude that Ningbo ETDZ's non-governmental general manager,

rather than the state-owned shareholder, "is in a position to control, and does control, the

operations of Ningbo ETDZ comports with a reasonable reading of the record."  *Id*. at 1272.

This statement appears to confirm that Yingli China's export activities fulfilled through YGEA,

an independent reseller, justify the conclusion that Yingli China's export activities are *not* controlled by the GOC.

Nevertheless, Commerce argues in Yingli's case that the line of Commerce decisions that Yingli China relied on in its case brief for the proposition that GOC-owned exporters should be afforded a fair chance of proving independence from Government control were cases all decided before the decision in *Advanced Technology*, 938 F. Supp. 2d 1342.  *See* Yingli Case Br. at 4, **CR257; PR367**, citing to *Circular Welded Carbon Quality Steel Line Pipe from China*, 74 Fed. Reg. 14,514 (Mar. 31, 2009) and *Utility Scale Wind Towers from China*, 77 Fed. Reg. 75,992 (Dec. 26, 2012); Final IDM at 11, **PR383**.  A third case that Yingli China cited in its case brief, *Small Diameter Graphite Electrodes from China*, 81 Fed. Reg. 62,474 (Sept. 9, 2016) concerned a company that was only minority owned by the GOC, which Commerce distinguished from Yingli China's case.  Yingli Case Br. at 4; Final IDM at 5.

Commerce has made perfectly clear that a respondents' chances of rebutting majority GOC ownership is practically nil.  Final IDM at 13-14.  The policy that GOC majority ownership "supports" a finding of GOC control is, in fact, a *per se* rule, for which Commerce relies on *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308 (Ct. Int'l Trade 2018).  In *Zhejiang Refrigerants*, the Court stated:

> when, as here, the government owns a majority stake, legal separation between the exporter and its direct and indirect parent companies does not rebut the presumption because of the *ever-present potential* for the government to exert de facto control over the exporter's operations and management selection, and the *expectation that it would do so*.
> ……..
> The lack of evidence of specific instances of actual control does not render Commerce's finding unsupported by substantial evidence; indeed, in the context of majority government ownership, requiring Commerce to point to such evidence turns the presumption on its head by placing the burden on petitioners to prove the absence of autonomy.

*Zhejiang Refrigerants*, 350 F. Supp. 3d 1308, 1318, 1321-22 {emphasis added}.

The Court's decision is based on the *per se* assumption of GOC control of Chinese exporters, which evidently obviates the need to actually prove with substantial evidence that the GOC exercised such control. The Court's position in this regard appears to be contradicted by the higher courts' standard of review stated above. Be that as it may, the quote from *Zhejiang Refrigerants* summarizes the characteristics that are an integral part of the so-called "NME Presumption," which this Court has described as follows:

> As part of its NME presumption, Commerce presumes that all Chinese exporters are part of the NME Entity—a single, country-wide concept employed by Commerce as a sort of legal fiction. The NME Entity is neither "China" nor the "Government of China," but consists of all Chinese exporters and producers of subject merchandise for export to the United States. Since these companies operate in a nonmarket economy, Commerce presumes that they all operate subject to government control.

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 617 F. Supp. 3d 1343, 1347 (Ct. Int'l Trade 2023).

In *Jilin Forest*, as in Yingli China's case, Commerce selected Jilin Forest as a mandatory respondent. *Id*. at 1348. The *Jilin Forest* Court considers first the statutory basis for the so-called "Mandatory Respondent Exception"[1] and concludes:

> "'The statute clearly directs that Commerce must determine an individual rate for respondents chosen for individual examination as mandatory respondents, because they are 'known' exporters or producers.' *Jilin I, 45 CIT at  , 519 F. Supp. 3d at 1244* (citing *19 U.S.C. § 1677f-1(c)*). While Commerce may apply facts available or adverse facts available to a mandatory respondent when certain conditions are met (e.g., to fill gaps in the record of necessary information), the statute does not indicate that Commerce can simply assign a rate to a mandatory respondent based on its relationship to an NME government. *See* 19 U.S.C. § 1677e.

---

[1] "The use of the statutory Mandatory Respondent Exception is authorized when the number of respondents in a proceeding is so 'large' that it is 'not practicable to make individual weighted average dumping margin determinations.'" 19 U.S.C. § 1677f-1(c)(2). *Jilin Forest*, 617 F. Supp. 3d 1343, 1350 and further discussion at 1351-1353.

*Jilin Forest*, 617 F. Supp. 3d at 1353 (Ct. Int'l Trade 2023), citing to *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F. Supp. 3d 1224 (Ct. Int'l Trade 2021).  The Court goes on to find that Commerce has never explained the reason behind its NME Presumption, which is also not found in the antidumping statute nor Commerce's regulations.  *Jilin Forest* at 1353-1355.  The *Jilin Forest* Court also finds that *Chevron* deference[2] does not apply because "for the agency to get *Chevron* deference for a policy, the question becomes whether the agency's action or presumption is based on a 'permissible' construction of an identified statute (not a regulation). *Id*. at 1356.  In Yingli China's case, as with *Jilin Forest*, Commerce does not rely on any statutory authority for its application of the NME Presumption.

The *Jilin Forest* Court next expends considerable effort searching for the statutory authority for the NME Presumption, and finds none.  *Id*. at 1356 – 1363.  Regarding court cases decided by the U.S. Court of Appeals for the Federal Circuit ("CAFC"), the *Jilin Forest* Court refers to Commerce's reliance on the findings of the CAFC in *Sigma Corp. v. United States*, 117 F.3d 1401 (Fed. Cir. 1997):

> Commerce next claims that the Court of Appeals for the Federal Circuit has identified general statutory recognition of a "close correlation between nonmarket economy and government control of the prices, output decisions, and the allocation of resources," and that Commerce has the "broad" authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate.

*Jilin Forest*, 617 F. Supp. 3d 1343, 1366-67.  The Court finds that this is the sole legal authority for Commerce's NME Presumption: "When distilled to its essence, Commerce's explanation for using its NME presumption, with respect to Jilin, is not from statute, nor from any regulation, but is merely a practice bolstered by Federal Circuit dicta that Commerce has 'broad authority to

---

[2] *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984); as discussed below, the Supreme Court overruled *Chevron* in *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2267 (2024).

interpret the antidumping statute and devise procedures to carry out the statutory mandate.'" *Id*.
at 1368.

The Court concluded that Commerce has also failed to support its NME Presumption
with any explanation of the reason for its application as well as unsupported by statute or
regulation that could justify Commerce ignoring the statutory directive to calculate an individual
weighted average dumping margin for Jilin as a mandatory respondent in accordance with 19
U.S.C. § 1677f-1(c)(2).  This principle applies equally to Yingli China as a mandatory
respondent in the administrative review underlying this instant litigation.

Finally, *Jilin Forest* notes that "{r}ecent cases also suggest that the wind is blowing
against wide-ranging claims for deference."  *Jilin Forest* at 1367, citing, among other court
decisions *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (stating that agencies have only those
powers given to them by Congress, and Congress does not intend to leave major policy decisions
to agencies).[3]  The *Jilin Forest* Court's discussion in this regard is prescient; after this decision,
the Supreme Court decided *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).

---

[3] The United States appealed the decision in *Jilin Forest*, CAFC Case No. 23-2245.  The case is currently
awaiting a date for oral argument.  Further cases currently before the CAFC concerning Commerce's
NME Presumption are:

- *Guizhou Tyre Co., Ltd. v. US*, Fed Cir. Case No. 23-2165 (companion case to 23-2163) – same
  Appellant, an exporter with minority state ownership, challenging its separate rate denial in the
  less-than-fair-value investigation of truck and bus tires from the People's Republic of China
  based on specific record evidence; (waiting for scheduling of oral argument);

- *Guizhou Tyre Co., Ltd. v. US*, Fed Cir. Case No. 23-2163 (companion case to 23-2165) – same
  Appellant, an exporter with minority state ownership, and another Appellant, also an exporter
  with minority state ownership, challenging their separate rate denial in the seventh administrative
  review of the antidumping duty order on certain pneumatic off-the-road tires from the People's
  Republic of China based on specific record evidence (waiting for scheduling of oral argument);

- *China Manufacturers Alliance, LLC v. US*, Fed. Cir. Case No. 23-2391 (companion case to 23-
  2163) – Appellant, an exporter with majority state ownership, challenging its separate rate denial

*Loper* concerned the question as to whether the Court owed deference under *Chevron* to the National Marine Fisheries Service's interpretation of its authority to require owners of regulated vessels to pay for at-sea monitors. *Loper*, 144 S. Ct. 2244, 2256.  The National Marine Fisheries Service is a U.S. Federal agency within the U.S. Department of Commerce, and according to the *Chevron* doctrine, courts were required to defer to "permissible" agency interpretation of the statutes they administer.  *Id*. at 2254.  *See Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 865, 866 (1984).  In *Loper*, the Supreme Court overruled *Chevron*, stating.

> *Chevron* is overruled. Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires. Careful attention to the judgment of the Executive Branch may help inform that inquiry. And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it. But courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.

*Loper*, 144 S. Ct. 2244, 2273.  This court must therefore apply all relevant tools in determining whether Commerce's practice in applying the NME Presumption lies within some "broad authority" that Commerce continues to have in interpreting the antidumping statute and whether Commerce's interpretation is the best one.  *Id*. at 2266 ("It therefore makes no sense to speak of a 'permissible' interpretation that is not the one the court, after applying all relevant interpretive

---

in the fifth administrative review of the antidumping duty order on certain pneumatic off-the-road tires from the People's Republic of China based on specific record evidence (waiting for scheduling of oral argument);

- *Pirelli Tyre Co., Ltd. v. US*, Fed. Cir. Case No. 23-2266 – Appellant, an exporter with minority state ownership, challenging its separate rate denial in the third administrative review of the antidumping duty order on passenger vehicle and light truck tires from the People's Republic of China based on specific record evidence (oral argument held on January 6, 2025).

PUBLIC VERSION

tools, concludes is best. In the business of statutory interpretation, if it is not the best, it is not permissible.").

In its final determination in Yingli China's case, Commerce does not rely directly on *Chevron* deference in support of its application of the NME presumption in finding Yingli China ineligible for a separate rate. As discussed above, however, the concept of Commerce's "broad" authority to interpret the antidumping statute and devise procedures to carry out the so-called "statutory mandate" as expressed in *Sigma* appears to be closely aligned with the now overturned *Chevron* doctrine. *Sigma*, 117 F.3d 1401, 1405 (Fed. Cir. 1997) ("Commerce, however, has broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate" citing to *Torrington Co. v. United States*, 68 F.3d 1347 (Fed. Cir. 1995)). *Torrington*, on the other hand, does rely on the *Chevron* doctrine for its conclusion that "{i}n antidumping cases, we accord substantial deference to Commerce's statutory interpretation, as the International Trade Administration is the 'master' of the antidumping laws." *Torrington* at 1351. This Court has even acknowledged that Commerce has created "an entire regulatory scheme for an NME-wide entity." *Guizhou Tyre Co. v. United States*, 641 F. Supp. 3d 1371, 1381 (Ct. Int'l Trade 2023). But this entire "scheme" is based solely on the CAFC's perception of Commerce's "broad discretion" in applying the law. The *Guizhou Tyre* Court stated: "According to the reasoning in those cases, Commerce should be allowed broad discretion not only in applying its presumption but also in setting forth the criteria by which it will effectuate it." *Id*. referring *to China Mfrs. Alliance, LLC v. United States*, 1 F.4th 1028, 1039 (Fed. Cir. 2021) and *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1313 (Fed. Cir. 2017). After *Loper*, however, the CAFC's obeisance to Commerce's deference cannot stand, especially in questions of law, as here.

> {B}y directing courts to 'interpret constitutional and statutory provisions' without differentiating between the two, Section 706 {of the APA] makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are not entitled to deference. Under the APA, it thus 'remains the responsibility of the court to decide whether the law means what the agency says.' *Perez v. Mortg. Bankers Ass'n*, 575 U. S. 92, 109 . . . (2015). . ..

*Loper*, 144 S. Ct. 2244, 2261.

Commerce has no "statutory mandate" in applying its NME Presumption as to Yingli China. In light of the CIT's decision in *Jilin Forest* and the Supreme Court's decision in *Loper*, Yingli China requests that this Court find that Commerce had no legitimate authority to apply a NME Presumption as to Yingli China. The U.S. antidumping statute requires Commerce to *calculate* an individual dumping margin for Yingli China as a mandatory respondent; not *assign* a rate based on a non-legislative policy, as Commerce did here. Commerce's NME Presumption has no legal basis in the antidumping statute or Commerce's regulations. The only formal statement of the NME Presumption is Commerce's Policy Bulletin 05.1, which sets out the criteria for its application but not the purpose of the application. *See Zhejiang Refrigerants*, 650 F. Supp. 3d 1308, 1314 (discussing the Policy Bulletin as part of the "Legal Framework Governing Separate Rate Status in Proceedings Involving Nonmarket Economy Countries." This Court, however, owes no deference to Commerce's policy bulletin.). As the U.S. Supreme Court stated in *Perez v. Mortg. Bankers Ass'n:* "{t}he absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price: Interpretive rules do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96-97 (2015), citing *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995).

Further, Commerce has provided no viable reason for the presumption's application in Yingli China's case. U.S. dumping laws are remedial and designed to "level the playing field" in the foreign exporter's competition with the relevant U.S. domestic industry. *See, e.g., Xi'an Metals & Minerals Imp. & Exp. Co. v. United States*, 50 F.4th 98, 101 (Fed. Cir. 2022) ("Commerce protects domestic producers from unfair trade practices, such as dumping, by investigating whether imported merchandise is being sold in the United States at less than fair value and imposing antidumping duties on subject merchandise *to level the playing field*.") {Emphasis added.} Whereas the U.S. antidumping law allows Commerce to account for GOC involvement in commercial activities by applying surrogate values for calculating a Chinese exporter's factors of production, 19 U.S.C. § 1677b(c)(4), nowhere does U.S. antidumping law authorize the application of an adverse rate to a cooperating Chinese mandatory respondent where the criteria in 19 U.S.C. § 1677e are not given.

Yingli China submits that no legitimate reason exists for Commerce's assignment of the adverse PRC-entity rate of 238.95 percent *ad valorem* rather than the statutory mandated individually calculated rate, and this Court should reverse Commerce's application of its NME Presumption in Yingli China's case.

## V.    CONCLUSION AND PRAYER FOR RELIEF

In light of the foregoing, Commerce's *Final Results* were not supported by substantial evidence or in accordance with the law. Yingli China requests that the Court remand this case for redetermination and calculation of Yingli China's individual and separate rate based on the company's submissions during the underlying administrative review because (1) Yingli China's

PUBLIC VERSION

export activities were not dictated by the GOC and (2) no legal basis exists for Commerce's

application of an NME Presumption as to Yingli China.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
Judith L. Holdsworth
Vivien Jinghui Wang[**]
**DEKIEFFER & HORGAN, PLLC**
Suite 1101
1156 Fifteenth St., N.W.
Washington, DC 20005
Tel: (202) 783-6900
email: gmenegaz@dhlaw.com
*Counsel to Plaintiff*

</div>

Date: January 16, 2025

---

[**] Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

PUBLIC VERSION

### Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2007 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **6,911** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DeKieffer & Horgan, PLLC**
Suite 1101
1156 Fifteenth St., N.W.
Washington DC  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*